UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1:09-CR-28** |
| | ) | |
| **JUAN SALAS** | ) | |

**OPINION AND ORDER**

This matter is before the court on the Motion to Suppress Evidence filed by defendant

Juan Salas on July 15, 2009 (docket at 18). Salas also filed a memorandum of law in support of

his motion ("Defendant's Memorandum," docket at 19). The United States of America ("the

government") filed a response in opposition to the motion on July 27, 2009 ("Government's

Response," docket at 23). An evidentiary hearing was set, but both sides moved to continue it.

The hearing was finally held on September 18, 2009. *See* docket at 28. A second evidentiary

hearing was held on October 19, 2009. *See* docket at 32.[1] At the conclusion of the second

hearing, the court instructed both sides to file additional briefs addressing the issues raised at the

hearings. Salas filed his second brief in support of his motion on December 2, 2009

("Defendant's Supplemental Brief," docket at 36). The government, after moving for and

receiving extensions of time in which to do so, filed its second response brief on January 29,

2010 ("Government's Supplemental Response," docket at 41). Finally, Salas filed a reply brief

on February 16, 2010 ("Defendant's Reply," docket at 42). For the reasons discussed herein, the

---

[1] During the course of the two evidentiary hearings held in this case, the court heard testimony
from Officer James Gasvoda, Officer Scott Heck (the police officer who had a police canine at the scene),
Santino Morales, who is Salas's brother, and the defendant himself. *See* Transcript of Evidentiary
Hearings of September 18 and October 19, 2009 (docket at 35). In addition to the testimony, various
other evidence was introduced, which is discussed below. During both hearings, the court had the
opportunity to listen to the testimony of the witnesses (including the defendant), observe their demeanor
while testifying, and assess their credibility.

motion to suppress is DENIED.

## DISCUSSION

Salas was charged in an Indictment filed on February 25, 2009, with one count of

possession with intent to distribute cocaine base or "crack," in violation of 21 U.S.C. § 841(a)(1)

and one count of carrying a firearm during and in relation to a drug trafficking crime, in violation

of 18 U.S.C. § 924(d).  Indictment, docket at 1.  The charges stem from an encounter with police

that Salas had on the evening of January 22, 2009.  On that date, Salas was driving a 2003 Buick

Rendevous in Fort Wayne.  Fort Wayne Police Officer James Gasvoda, according to his

testimony, observed Salas's vehicle exceeding the posted speed limit and driving across the

center line, and also noticed that the rear passenger-side brake light on the car was not

functioning.  Gasvoda initiated a traffic stop of Salas's vehicle.  Salas "concedes that the police

officer had a basis for the traffic stop."  Motion to Suppress, p. 1.[2]  Shortly after Gasvoda

stopped Salas's vehicle, the vehicle was searched.  A small amount of marijuana was found on or

near the front passenger seat and a handgun was discovered in a rear compartment.  The search

was conducted after a police dog alerted to the presence of drugs.  Moments after Gasvoda

pulled Salas over, another police officer arrived on the scene with a drug detecting canine.  A

"free air search" was conducted and the dog alerted, indicating the probable presence of drugs in

the vehicle.  Salas was arrested for carrying a handgun without a license and transported to

police headquarters.  Later, at the police station, police officers discovered that Salas was in

possession of crack cocaine.  In addition, Salas made incriminating statements to police after the

---

[2] Actually, Salas contends that he was not speeding, but admits that his rear brake light was not functioning, giving Gasvoda a justifiable reason to stop Salas's vehicle.  *Id*.

discovery of the crack. In his motion to suppress, Salas contends that the search of his vehicle was illegal and "was in violation of the Fourth Amendment . . . and that the Government should be precluded from introducing into evidence any property found subsequent to the illegal search, as well as any statements made by the Defendant." *Id*., p. 2. More specifically, Salas "contends that no probable cause existed to believe that any contraband or evidence of criminal activity would be found in the car. . . . Defendant contends that there was not a sufficient basis upon which the police officer could form a reasonable conclusion that there was probable cause to believe that the vehicle contained contraband or evidence of criminal activity." Defendant's Memorandum, pp. 1-2.

After Gasvoda pulled Salas over, he approached the vehicle to speak with Salas. Government's Response, p. 1. When Gasvoda approached the passenger side window, which Salas had rolled down, and spoke with Salas, the officer "noticed that Salas appeared nervous, was shaking, and had poor eye contact." *Id.* Salas's behavior made Gasvoda suspicious and he asked Heck, who had just arrived, to retrieve his police dog and conduct a free air search of Salas's vehicle. Tr., p. 23. When asked about this at the first evidentiary hearing, Gasvoda explained his reasoning as follows:

> Q. And your reason for asking Officer Heck to do the free-air search was because of the nervousness that you saw by Mr. Salas?
>
> A. More than just that, yes. That's why I asked if he had any medical problems, to make sure that there wasn't a need or a reason why–you know, I wanted to make sure I didn't have medical need to give attention to right there or there was a reason why he was shaking, his hands were trembling almost uncontrollably when he was trying to grab his registration. He was unfocused. He had [poor] eye contact. It's what I asked him certain things not what only what [sic] he says, but the manner which it's said to indicate that something may be afoot.

Tr., p. 23. Heck retrieved his police dog, Bruno, and "proceeded with Bruno around the driver's

side of the vehicle to the front. He then proceeded around the passenger side and indicated to

Gasvoda that Bruno had alerted." Government's Response, p. 2. Heck testified that as a result

of Bruno's alert, he searched Salas's vehicle and found a handgun in a rear storage compartment.

Tr., p. 45. When testifying at the hearing, Heck explained what happened with Bruno:

> Q. Can you explain what you did?
>
> A. Officer Gasvoda asked me to perform a free-air sniff of the exterior of the vehicle that he had stopped. I retrieved my K-9 partner from my police car, walked him up . . . I placed his collar on him, walked him up to the front of the vehicle, and began my search pattern. . . .
>
> Q. Now, what's happening in the front of the car here (indicating) that we can't see on the camera?[3]
>
> A. When I went around the first time, Bruno alerted on the front to the–as you're sitting in the car, it would be to the right of the driver's side headlight around the grille, you know, the grille portion of the automobile. I had taken him off, brought him back to do another. I always give people the benefit of the doubt with him. I trust him, but I want to run him again.
>
> Q. Okay. Did he alert the second time?
>
> A. Yes, sir, he did.

Tr., pp. 40-41. The videotape of the entire incident, introduced into evidence as Government's

Exhibit 1 and played in open court, corroborated the officers' testimony. At the point when

Heck said Bruno alerted to the presence of drugs, the dog was near the front of the vehicle and

not visible on the videotape. Salas seizes on this fact and bases his motion to suppress on his

allegation that "there was no such alert [by Bruno] and the evidence demonstrates the

unreliability of Bruno as a source for probable cause." Defendant's Memorandum, p. 5. In other

---

[3] During this portion of Heck's testimony, the videotape of the entire traffic stop was played in the courtroom. The court was able to view the video while the officer testified.

words, Salas claims that Heck lied about Bruno's alleged alert. Salas also argues that even if

Bruno did alert, the evidence proves that the dog was unreliable. Salas argues as follows:

> There is nothing on the video to indicate that Bruno alerted to the presence of drugs. Heck testified that Bruno was trained to give a passive alert if he hit upon any drugs . . . . In other words, he would sit if he detected the presence of drugs. . . . Bruno was on camera while at the back of the vehicle and on each side of the vehicle but not at the front of the vehicle. It was at the front of the vehicle that Heck says [Bruno] alerted. He did not alert, however, as he passed by the closest point on the vehicle to where the officers said the marijuana was found. He was taken around the vehicle a second time and, again, did not alert as he went by the front passenger area. Heck claimed he alerted on this second trip but, again, at the front of the vehicle. Conveniently, this is outside the view of the camera.

Defendant's Memorandum, pp. 11-12. This is all true. But, as explained below, it does not

change the fundamental fact that the officers had probable cause to search Salas' vehicle.

Salas also argues that Bruno's alerts, if in fact they happened as Heck testified, were

unreliable and cannot form the basis for probable cause for a search. Defendant's Reply,

generally. Salas bases this argument on the fact that Bruno did not alert when he was sniffing

near the passenger side of the vehicle, nearest to where the marijuana was discovered. He also

bases his argument on another incident that transpired during the course of the traffic stop. A

few minutes after Salas was pulled over, his brother, Santino Morales, arrived at the scene in a

separate vehicle and parked in a parking lot across the street from where Salas's vehicle was

stopped. Defendant's Supplemental Brief, p. 3. Salas points out that "Gasvoda asked Heck to

have Bruno do a free-air search of Morales' car. . . . Bruno alerted to the Morales vehicle but a

subsequent search did not reveal any drugs in the car . . . ." *Id.* Based on Bruno's failure to alert

on the passenger side of the Salas vehicle and his alleged wrongful alert on the Morales vehicle,

Salas contends that "probable cause did not exist for the search of his vehicle." *Id.* In addition,

the crack cocaine found on Salas after he was transported to the police station had been

concealed under his clothing. After Heck had Bruno perform the free air search of Salas's

vehicle, Heck walked the dog back to his patrol car. When he did so, Heck and Bruno passed

very closely behind Salas, who was standing and talking to Gasvoda. Defendant's Reply, p. 1.

Heck testified that as the dog passed Salas, he lunged toward Salas. Tr., p. 56. It is undisputed

that at that moment, Bruno did not perform a passive alert, i.e., he did not sit down near Salas.

Salas concedes that he "had a substantial amount of cocaine on him at the time." Defendant's

Reply, p. 1. According to Salas, if Bruno was reliable, he should have alerted to the presence of

drugs on Salas's person when he passed within two feet of him as Heck was leading him back to

the patrol car. *Id*.

      The problem with Salas's argument concerning Bruno's alleged unreliability is that Heck

explained, in an entirely credible manner, how and when Bruno would alert to the presence of

drugs. It is necessary to recount a large portion of Heck's testimony to understand this point:[4]

> Q. Have you had instances where, in your training–or in practical experience, I
> guess more so, where Bruno has alerted and no drugs were found, but you later
> found out that drugs had been present, you know, hours before or days before in
> that location?
>
> A. Yes, sir, we have.
>
> Q. And based on your knowledge of the way dogs work and the capabilities of
> your own dog, is it possible for drugs–for dogs to alert to the presence of drugs
> once the drugs have been removed from a location?

---

[4] Officer Heck testified in detail concerning how Bruno was trained to detect drugs and the fact
that Bruno "successfully completed in-service training at the Indiana Law Enforcement Academy . . . in
December 2008 and January 2009." Government's Supplemental Brief, p. 2. Salas does not challenge
Bruno's training or his certifications as a drug detecting canine. Instead, Salas argues that Bruno's
actions on the night Salas was arrested reveal that the dog, for whatever reason, was unreliable on that
occasion. Since Salas does not challenge Bruno's training or qualifications, the court need not recount
Heck's testimony on that point.

A.  Yes, sir.  The odor of narcotic will stay behind.  It does back to the analogy of you cook fish on Friday, your kitchen still stinks on Saturday.  The odor of the narcotic's still in the vehicle.

Tr., pp. 45-46.

Q.  Have you had experience with your dog, Bruno, where he has alerted to residual odor?

A.  In training experiences, yes, sir.

Q.  And can you explain to the court what residual odor is?

A.  The best analogy I can give is, like I said last time, if you cook fish in your kitchen on Friday, that evening or Saturday it's going to still have that odor of fish.  Dogs' noses are considerably more sensitive than human beings.  In this case that I'm talking about, our master trainer for the Allen County Police Department had requested I bring my K-9 partner out to Indiana Auto Auction off Washington Center Road, which is where we do a lot of narcotics training with our dogs for the cars and stuff, the certifications.  And there was a car in question that a few other dogs they had been working around showed interest in.  So the master trainer asked me if I would bring my K-9 partner out and do a search of the car with my dog.  When I ran him around the car, he had no interest, no change of behavior, nothing.  And the vehicle that was sitting immediately to the south of the car in question, my K-9 had went over and had stuck his–the car had been wrecked, so the headlight assembly was missing.  There was a large hole in that in the body structure, and my K-9 had stuck his nose in there and had alerted quite strongly to the car.  I had pulled him off, and they had informed me that two days prior, they were using that car in that specific area for training and had narcotics planted inside that area.  So the residual odor was still in that car after, at least, 48 hours.  And my dog had alerted to it at that point.

Tr., pp. 96-98.

As to Bruno's failure to perform a passive alert, i.e., to sit still when he walked by Salas and, at least arguably, smelled the crack cocaine concealed in Salas's clothing, Heck explained on cross-examination as follows:

Q. . . . When he showed an interest in, or lunged at or sniffed at Mr. Salas's crotch area, did he sit down?

A.  No, I didn't give him a chance to.  Mr. Salas had made a quick abrupt

7

movement away from him. And our department has worked really hard to lose that stigma that our dogs are aggressive. People are scared of 'em. I didn't know why he had done that. He had never behaved that way before, so I immediately pulled him away–took him away. I didn't even give him a chance to do his job, I guess.

Q. Had you not ever used your dog to search humans before?

A. I have, yes, sir.

Q. Okay.

A. But he had never shown that kind of quick–he was walking by. I don't know if you own animals or not, but if you're walking your dog, you know, sometimes they'll turn [their] head, like dart after towards something. He [had] never done [that] before, but he had done it that day for some particular reason, and Mr. Salas had jumped back and made a sudden noise, and I hurried up and pulled him away. I didn't want him to fear the dog. I knew he wouldn't hurt him, but I didn't want him to feel in fear of the dog.

Tr., pp. 98-99. As stated above, the court found Heck's testimony to be completely credible throughout (as was Gasvoda's testimony). Based on this testimony, the government argues as follows:

Drug detection canines alert to the odor emitted by the drug. . . . Bruno has had instances where he alerted to a location and no drugs were found, but where it was later determined drugs had been present in the location hours or days before. . . . In such instances, drug detection dogs are alerting to the residual odor left behind by drugs which were previously in th location. . . . Bruno has successfully detected locations where drugs were stored and then removed. . . . The fact that crack cocaine was in [Salas's vehicle] immediately prior to the alert by Bruno and that the Buick was used to store and transport cocaine for an extended time could indicate that when Bruno was alerted it was to the residual smell of cocaine in the vehicle. . . .

Government's Supplemental Response, p. 2.

After Heck had placed Bruno back into his patrol car he searched Salas's vehicle. It was at that point that "Heck observed a green leafy substance in the door panel and on the floorboard, some of which was seized by Officer Gasvoda. . . . He also discovered a loaded 45 caliber

8

handgun in a storage area inside the rear hatch. . . . The defendant had a prior firearm[]

misdemeanor conviction and did not have a handgun permit so his possession of the handgun

was a felony offense rather than a simple misdemeanor. . . ." *Id*., p. 4.[5]

The government correctly points out that "traffic violations committed by the defendant

gave the officers probable cause to stop his vehicle." *Id*., p. 5 (citing *Maryland v. Wilson*, 519

U.S. 408 (1997)). In fact, as stated above, Salas "concedes that this right rear brake light was not

operating properly and would have provided a basis for the traffic stop. Salas recognizes that a

traffic violation gives police probable cause to stop a vehicle." Defendant's Supplemental Brief,

p. 3 (citations omitted). Salas further concedes that a free air search by a police canine is not a

search that implicates the Fourth Amendment and further concedes that the Seventh Circuit has

held "that a dog's alert, without anything more, is sufficient probable cause to believe that drugs

may be present." *Id*. (citations omitted). Salas states that "these dog sniffing cases seem to

support the Government's contention that a dog's alert of narcotics is, by itself, a sufficient basis

for a search of the car. Although Salas may not agree with the conclusion he, nonetheless, has to

live with it for purposes of his suppression motion." *Id*., pp. 4-5.

Salas, then, does not challenge Bruno's training or qualifications. He does not dispute

that an alert by a police canine provides probable cause for the search of a suspect's vehicle.

Instead, he challenges Heck's credibility and Bruno's reliability on the night he was stopped,

searched, and arrested. However, the court has already stated that both officers testified credibly

concerning the events that transpired when Salas was arrested. And while it is true that Bruno's

---

[5] The marijuana found in Salas's vehicle was introduced into evidence as Government's Exhibit 4.

alert is not captured on the videotape, since Bruno was blocked from view at the moments when

he alerted, the court has no reason to disbelieve Heck's testimony on this point.  Once Bruno

alerted, the officers had probable cause to search Salas's vehicle.  And as the government points

out, while Gasvoda may not have noticed the small amount of marijuana on the front seat or

front floorboard of Salas's vehicle when he first approached Salas and was waiting for him to

produce his registration, the evidence supports Heck's testimony that the marijuana might not

have even been what caused Bruno to alert in the first place.  By his own admission, Salas was in

possession of a substantial amount of crack cocaine and Bruno very well could have detected the

odor of that substance.  The crucial point in this case is that Heck testified that Bruno alerted

twice to Salas's vehicle, a fact the court finds believable and credible. Salas does not dispute that

such an alert provides probable cause to search a suspect's vehicle.  The case law is replete with

such holdings.  *See, e.g.*, *Illinois v. Caballes*, 543 U.S. 405 (2005) (alert by police dog gave state

troopers probable cause to search vehicle); *U.S. v. Martin*, 422 F.3d 597 (7th Cir. 2005) (free air

sniff by drug detection canine provided probable cause for search); *United States v. Hernandez*,

24 F.App'x 560, 562 (7th Cir. 2005) (unpublished) ("dog's alert alone supplies probable cause

that drugs are present."); *United States v. Rogers*, 387 F.3d 925 (7th Cir. 2004) (reasonable

suspicion elevated to probable cause once drug detecting canine alerted).  As the government

points out, several other circuit courts have issued similar rulings.  Government's Response, p. 4

(citations omitted).

Given that the court concludes that Heck's testimony concerning Bruno's alert was

credible, Salas's challenge to the search of his vehicle fails.  Even assuming, for the sake of

argument, that Bruno's alerts on the evening in question were erroneous (as Salas implies as an

alternative to his argument that Heck was lying about the alerts in the first place), what is important is what the officers knew at the time they searched Salas's vehicle. Given the totality of the circumstances, the police clearly had probable cause to search the car. As soon as Gasvoda approached Salas he noticed that Salas was extremely nervous, his hands were shaking uncontrollably, and he was reluctant to make eye contact with Gasvoda.[6] Already suspicious that something may be amiss, Gasvoda asked Heck to retrieve Bruno and perform a free air search. Bruno alerted twice at the front of Salas's vehicle. Whether Bruno's alerts were accurate or not is irrelevant. Gasvoda was suspicious of Salas from the outset and his suspicions were confirmed when Heck indicated to him that Bruno had alerted to the presence of drugs. Bruno's alerts provided Gasvoda and Heck with probable cause to search the vehicle, which resulted in the discovery of the marijuana (albeit a very small amount) and the handgun. For these reasons, Salas's motion to suppress will be denied.

**CONCLUSION**

---

[6] In the videotape of the traffic stop, Gasvoda clearly can be heard asking Salas why he is so nervous when he first approaches the vehicle and begins talking to Salas.

11

For the reasons discussed in this Opinion and Order, the Motion to Suppress Evidence (docket at 18)  filed by defendant Juan Salas, is DENIED.

March 2, 2010.

   /s/   William C. Lee
          William C. Lee, Judge
          United States District Court
          Northern District of Indiana